IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| United States of America, | ) |
| | ) |
| v. | ) Case No. 1:23-po-0623 |
| | ) |
| Justin Gayles | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

Defendant Justin Gayles ("Gayles") is charged with (1) impermissibly driving in a closed road lane in violation of 36 C.F.R. § 1.5(f), (2) operating a vehicle under the influence of alcohol, or a drug, or drugs, or any combination thereof in violation of 36 C.F.R. § 4.23(a)(1), and (3) refusal to submit to a test to determine blood alcohol content in violation of 36 C.F.R. § 4.23(c)(2). A bench trial was held on April 24, 2024, after which the Court took the matter under advisement.

The Court has carefully considered the evidence adduced at trial and finds that the Government has met its burden on all three counts. For the reasons that follow, the Court finds Defendant Gayles **GUILTY** of violating 36 C.F.R. § 1.5(f), 36 C.F.R. § 4.23(a)(2), and 36 C.F.R. § 4.23(c)(2).

### I.     EVIDENCE ADDUCED AT TRIAL

The incident at issue occurred late in the evening of April 22, 2023, on a section of the George Washington Memorial Parkway ("GW Parkway"), a four-lane highway located within the Eastern District of Virginia. The GW Parkway runs north to south, from Great Falls, Virginia to Mount Vernon and is within the jurisdiction of the National Park Service. (Gov Ex. 2C.) The two lanes of

traffic in each direction are separated by a substantial median, most of which is covered in grass and has trees, bushes, and other plants. A scenic roadway with multiple designated overlooks, the GW Parkway is listed on the National Register of Historic Places. (Gov. Ex. 2C.) The portion of the Parkway at issue runs through Turkey Run Park and is wooded. (Gov. Ex. 1B; Tr. 17:7-10.)

As of August 2022, a nearly eight mile stretch of the GW Parkway has been undergoing a significant rehabilitation project. (*See* Gov. Exs. 2A, 2B, 2C.) At various times, the rehabilitation has included closure of all lanes of traffic in one direction, with traffic re-routed from the closed lanes to the other side of the Parkway. To accommodate the traffic pattern changes, sections of the Parkway have been temporarily widened so that two lanes of traffic could be changed to three (narrow) lanes. This allows traffic officials to authorize use of three lanes of travel when necessary during peak times, such as rush hour. (In the morning, two lanes go towards DC with a single lane going away from DC and during the evening rush hour period, this arrangement is reversed.) During non-rush hour times, the third lane is closed to traffic. (Gov. Exs. 2A & 2B.) Pertinent to the matter at hand is a section of the Parkway just a mile or two south of the exit from Interstate 495. (*See* Tr. 16:4–17:19.) This portion of the Parkway was in the rehabilitation construction zone on April 22, 2023. (*See* Tr. 43:4–43:22; Gov. Exs. 2A & 2B.)

The series of events that led to the three charges against Defendant occurred late in the evening on April 22, 2023. Karen Lee, an eyewitness who testified at trial, was returning home with a friend after attending a concert. (Tr. 15:21–25.) Ms. Lee drove on the GW Parkway to and from the concert. On her drive home, she exited Interstate 495 onto the GW Parkway, driving southbound. On the side of the Parkway on which Ms. Lee was traveling, only two lanes were open at the time— one lane for southbound traffic and the other for northbound traffic.[1] Ms. Lee testified that she was

---

[1] It was approximately 11:00 p.m., and, thus, well outside the rush hour.

able to discern which portion of the GW Parkway was closed because the closed lanes were blocked with barrels and other barriers. (Tr. 16:22–17:3.) She also testified that, in the section of the Parkway that was open to traffic, her lane—the southbound lane—was clearly delineated from the northbound lane by traffic barrels. (Tr. 17:18–19.)

About a mile and a half after she exited Interstate 495 onto the GW Parkway, Ms. Lee came upon a car that was stopped ahead of her in her lane. Because the lane in which she was traveling was the only open southbound lane, Ms. Lee had to stop behind the car that was blocking her lane. She testified that a man was outside of the stopped vehicle. After she came to a stop, Ms. Lee rolled down her window and asked the man standing outside if he needed help. The man responded to Ms. Lee with obscenities. (Tr. 17:24–18:6.) He then began moving the traffic barrels that were delineating the traffic lane. (Tr. 18:19–19:12.) At this point, Ms. Lee called 9-1-1 "because it wasn't a safe situation." (Tr. 20:11.) Ms. Lee's conversation with the 9-1-1 operator was recorded and the recording was admitted into evidence without objection. (Gov. Ex. 3.)

During the trial, Ms. Lee was not asked to identify Defendant; however, the Court finds that the evidence establishes beyond a reasonable doubt that the individual Ms. Lee observed is the Defendant, Justin Gayles. As discussed above, Ms. Lee testified that she called 9-1-1 after the man she observed outside of the stopped car responded with obscenities when she offered assistance and began moving traffic barrels. In her call with 9-1-1, Ms. Lee reported that the stopped vehicle was either "white or pale gray" with a temporary license plate that began with T and that the man was wearing light-colored shorts and sweatshirt. (Gov. Ex. 3.) She stayed on the phone with the 9-1-1 operator until law enforcement arrived. Shortly before law enforcement officers arrived at Ms. Lee's location, the man got into his car and drove away. (Gov. Ex. 3; Tr. 20:6–18.) As discussed below, Defendant Gayles was apprehended moments later after driving head-on towards a law enforcement

vehicle, crossing the median of the GW Parkway, entering the closed section of the Parkway, and stopping his car in front of a "Do Not Enter" sign. Evidence admitted at trial establishes that Gayles's vehicle matches the description of the vehicle Ms. Lee gave to the 9-1-1 dispatcher (Def. Ex. 1, at 5:25–5:38), he was wearing clothing consistent with the description Ms. Lee gave to the 9-1-1 dispatcher (*see, e.g.*, Def. Ex. 4, at 00:55, 1:44–2:00), and he was driving a vehicle with a temporary Maryland license plate bearing number T1032298. (Def. Ex. 1, at 5:05–6:15.) The temporary tag, which had expired in 2022, was registered to Justin Gayles. (Def. Ex. 1, at 5:40–6:15.) Accordingly, the Court finds that the evidence presented establishes that Defendant Gayles is the individual Ms. Lee observed on the evening of April 22, 2023.

While on the phone with 9-1-1, Ms. Lee narrated her observations of Defendant's behavior and actions. (Gov. Ex. 3.) She identified herself and gave her location as stopped on the GW Parkway headed southbound and just past the exit onto the Parkway from Interstate 495. She reported that a car was stopped and blocking the lane and that a man who "does not look dangerous" but also "does not look OK" was moving traffic barrels, including onto her car. (Gov. Ex. 3.) Ms. Lee testified at trial—and reported during the 9-1-1 call—that Defendant picked up a barrel from the line of barrels demarcating the various lanes of traffic from one another and set the barrel down in front of her car; he placed another barrel on the hood of her car. (Tr. 18:21–19:3.) In addition to his vehicle blocking all traffic in her lane (the southbound lane), Defendant also disrupted traffic in the adjacent northbound lane. Defendant did so by moving barrels that were the northbound lane. He also moved himself into the northbound lane of traffic, eventually lying down in traffic forcing vehicles traveling in that lane to try to maneuver around him and the barrels he had re-positioned into the northbound lane. (Tr. 19:6–12.) Ms. Lee further recalled that Defendant seemed preoccupied, appeared to be talking to himself, and did not seem particularly aware of the situation around him.

4

During her testimony, Ms. Lee recalled some general details about Defendant's clothes, including that they were "lightweight" and "pale" in color. (Tr. 19:15–16.) She specifically recalled that when she first pulled up behind his car, Defendant was wearing orange crocs and he lost one of those shoes during the process of laying down in the northbound lane. (Tr. 19:18–20.) At some point, he put on sunglasses even though it was 11:00 p.m. and the road was dark. (Gov. Ex. 3.) After moving barrels and laying in the road, Defendant returned to his car, got in, and drove away. Ms. Lee recalled that Defendant drove south and was going a normal speed "for taking off from a stop." (Tr. 20:4–5.) After Defendant drove away, Ms. Lee informed the 9-1-1 dispatcher that she could see the police cars coming, and that the police officers appeared to be coming towards her and in the opposite direction of Defendant. Ms. Lee then reported that Defendant and the officers were passing one another going in opposite directions. (Gov. Ex. 3.) At trial, Ms. Lee testified that, in her opinion, it seemed that Defendant might be off a medication, high, or drunk. (Tr. 22:17–20.)

Sergeant Alice Wilson, a 24-year veteran of the United States Park Police, testified that on April 22, 2023, at around 11:00 p.m., she responded to 9-1-1 calls about a vehicle stopped in the GW Parkway and a man in the road moving barrels. (Tr. 38:15–39:22.) Sergeant Wilson approached the scene in her patrol vehicle driving northbound on the GW Parkway, at which point she saw headlights coming towards her. (Tr. 39:20–40:1.) Sergeant Wilson recalled that the lane in which she was traveling was, at that time of night, closed to all traffic except emergency vehicles and that the car coming towards her was driving in a closed lane. (Tr. 43:7–25.) Sergeant Wilson activated her vehicle's emergency lights to make her vehicle as visible as possible to the car coming towards her head-on. (Tr. 44:7–14.) The car coming towards her "abruptly turned to the right" and crossed over the grassy median that separates the two directions of the GW Parkway. (Tr. 44:7–9, 55:6-11.) The vehicle drove across the median and entered the closed portion of the GW Parkway that was under

5

construction. (Tr. 44:8–10.) In her radio communications with the dispatcher and other officers, Sergeant Wilson reported that the vehicle was moving fast (Gov. Ex. 5; Def. Ex. 1, at 1:49) and testified that she was concerned for the safety of a tow truck driver towards whom the car was headed. (Tr. 54:21–55:5.) After crossing the median and entering the opposite side of the Parkway, the car stopped in front of an orange and white barrier with a red and white "Do Not Enter" sign. (Tr. 44:22–45:3.) Sergeant Wilson stopped her patrol car behind the vehicle to block it. (Tr. 45:13–15.) Defendant then exited the driver side of the car and walked quickly towards Sergeant Wilson's patrol car. Sergeant Wilson opened her door to put a barrier between her and Defendant and before Defendant reached her car door, another member of the U.S. Park Police approached from the side and pushed Defendant up against Sergeant Wilson's car. Defendant was then taken into custody. (Tr. 45:16–46:11.)

The evidence establishes that the scene was chaotic and dangerous. Law enforcement received several 9-1-1 calls apparently relating to Defendant's behavior of stopping his vehicle and laying down in traffic. At least five police cars, with lights flashing, responded to the scene where Defendant was ultimately detained. Multiple officers wore body cameras that recorded the events.[2] Two of the officers present on the scene—Sergeant Wilson and Officer Greg Harper—testified at trial. Sergeant Wilson has more than two decades of service with the Park Police. Officer Harper is a 19-year veteran of the Park Police and testified that he has performed more than 100 traffic stops in which a driver was suspected of being under the influence of alcohol or drugs.

---

[2] Both sides submitted body camera footage into evidence. To a large extent, the various body camera footage exhibits overlap. Specifically, Defendant submitted longer portions of the various body camera recordings (Def. Exs. 1–5), while the Government submitted several shorter clips from the same recordings. (Gov. Exs. 6–14.)

In her testimony, Sergeant Wilson described the GW Parkway construction project and resulting traffic disruptions as "dynamic," acknowledging that the construction teams decided traffic patterns based on the status of the construction work and set up traffic lanes accordingly. (Tr. 76:11, 78:1–12.) Sergeant Wilson testified that the scene was in the middle of a construction zone and dangerous, but that Defendant was behaving as if the situation was not a big deal. She recalled that, due to the circumstances, it was important to quickly remove Defendant and the officers from the scene, and that it was obvious that he needed to be tested for alcohol. (Tr. 81:8–17.) A tow truck was also called to the scene and construction personnel were summoned to replace the barrels that Gayles had moved and to ensure that the traffic pattern was reinstated correctly. (Tr. 79:7–11.)

Body camera footage reflects that Sergeant Wilson informed her fellow officers at the scene that she smelled alcohol on Gayles. (Def. Ex. 1, at 8:47–54.) Both Sergeant Wilson and Officer Harper testified that in their opinion, Gayles was intoxicated. (Tr. 79:18–20, 105:14–15.) Defendant was arrested for a closure violation and transported to a Park Police station for processing and testing. (*See* Def. Ex. 1, at 9:28–35 (Officer Harper stating that the roadway on which Defendant drove was closed).) Officer Harper testified that he did not try to perform any sobriety tests on the scene because it was "crazy there" and they needed to get to a safer location. (Tr. 94:13–24.) The entire encounter—from the scene to Gayles's transportation to and arrival at the station, through his processing and refusal of a breath test—was recorded on various body cameras and the recordings were admitted into evidence by both sides.

Officer Harper testified that he tried to administer a field sobriety test to Defendant at the station and that Defendant failed to comply with his directions. (Tr. 96:12–13.) Upon review of the body camera recording of the attempted administration, the Court finds the evidence inconclusive as to whether Gayles did or did not try to comply with Officer Harper's test instructions. There is no

7

dispute that the field sobriety test was not completed and the Court gives no weight to the attempted administration of the test or the testimony that Gayles failed to comply.

Subsequently, Sergeant Enrique Wong arrived at the station to administer a chemical breath test to Defendant. Sergeant Wong has been an officer with the Park Police for 18 years and is a certified intoxilyzer operator. He has administered approximately 50 intoxilyzer tests and has been involved in approximately 50 more cases where the defendant refused the intoxilyzer test. (Tr. 138:18–139:10.)

Sergeant Wong testified that he followed the standard procedure for administering a breath test. (Tr. 141:2–3.) He read Defendant his Miranda rights and Defendant signed a card acknowledging he understood those rights and did not have any questions. Sergeant Wong then read the 36 C.F.R. Chemical Testing Notice to Defendant. (Def. Ex. 7; Gov. Ex. 15A.) The notice informs potential defendants that refusing to submit a sample will result in being charged with refusal to submit to chemical testing. Sergeant Wong also notified Defendant of the maximum possible penalties for the offense of refusal and that evidence of refusal may be admissible in any related judicial proceeding. (Def. Ex. 5; Def. Ex. 7; Gov. Ex. 15A.) All of this was recorded on Sergeant Wong's body camera. (Def. Ex. 5.) Sergeant Wong also informed Defendant that the officers would not pursue a blood sample and were requesting only a breath sample. (Def. Ex. 5.) Consistent with this statement, Sergeant Wong crossed out the section of the 36 C.F.R. Chemical Testing Notice that pertains to "Person Receiving Notice for Blood." (*See* Def. Ex. 7.)

In accordance with standard procedures, Sergeant Wong asked Gayles if he had any illness or diseases, was on any medication or drugs, was under the care of a doctor, dentist, or psychiatrist, had any physical impairments or recent injuries, felt ill or sick, or suffered from acid reflux or heartburn. (Def. Ex. 5.) In response to these questions, Gayles stated that he had no illnesses or

8

diseases, was under the care of a psychiatrist for mental health, including depression and anxiety, and is prescribed Adderall. (Def. Ex. 5; Def. Ex. 7.) He reported that his prescribed dosage is 45 mg per day and that his most recent dose of Adderall had been two days prior. (Def. Ex. 5; Def. Ex. 7.) Gayles denied feeling ill or sick and noted his only recent injury was a scrape on his left ankle, which he showed to Sergeant Wong. (Def. Ex. 5; Def. Ex. 7.)

Following this exchange, Sergeant Wong again explained to Defendant that he was being charged with DUI and that refusing to submit to the breath test would result in also being charged with refusal. Mr. Gayles stated, "I'm not doing a breath test." (Def. Ex. 5, at 15:10.) Defendant then asked Sergeant Wong several questions. Specifically, Gayles asked about the reference on the 36 C.F.R. Chemical Testing Notice to 36 C.F.R. § 4.23 and whether Section 4.23 "is the federal code for marijuana." (Def. Ex. 5, at 16:04.) Mr. Gayles further asked whether marijuana is "classified" as a drug for the purposes of "driving under the influence of alcohol and/or drugs" in violation of 36 C.F.R. § 4.23(a) and asked whether he could be charged with "a DUI/DWI" even if he had a "medical marijuana card." (Def. Ex. 5, at 16:20.) The officers confirmed that intoxication by marijuana could be a basis for a DUI charge. Gayles also asked the officers to confirm that it is "impossible" to use a breath test to detect "weed or cannabis." (Def. Ex. 5, at 16:53–17:15.) The officers reiterated that the breath test was for alcohol. Gayles again refused to submit to the test. Defendant checked the box on the form indicating his refusal, wrote his initial next to the box, and signed the form. (Def. Ex. 7; Def. Ex. 5, at 16:45–17:55.)

## II.   ANALYSIS

As a threshold matter, there is no dispute that Defendant's conduct, including the eventual traffic stop and subsequent arrest, occurred on the GW Parkway and within the jurisdiction of the

9

National Park Service. Thus, the Court finds that the regulations contained in 36 C.F.R. Chapter 1 apply. *See* 36 C.F.R. § 1.2(a).

### a. Closure Violation

Defendant is charged with violating a closure under 36 C.F.R. § 1.5(f), which prohibits "[v]iolating a closure, designation, use or activity restriction or condition, schedule of visiting hours, or public use limit." As stated above, Defendant's conduct and operation of his vehicle occurred on National Park Service property. Additionally, the Court finds that Defendant's conduct and operation of his vehicle was in violation of a closure.

Specifically, the portion of the GW Parkway at issue was visibly under construction to drivers, including Defendant, and the travel lanes at the time of the incident on April 22, 2023 were conspicuously marked. Based on the evidence, the Court finds that it was clearly marked that only half of the GW Parkway was open to traffic and that the other half was under construction and entirely closed to traffic.[3] The half of the GW Parkway that was closed to all traffic was marked with "Do Not Enter" signs, traffic barrels, and other visible traffic barriers indicating the closure. Within the half of the GW Parkway that remained open to traffic, one lane was dedicated to southbound traffic and one lane was open to northbound traffic. The northbound and southbound lanes were clearly delineated from one another by numerous orange and white traffic barrels. Additionally, at that time of night, the third lane was available only for emergency vehicles.

Defendant violated the closures by moving barrels that had been set up to separate the southbound lane (in which he was traveling) and the northbound lane. Ms. Lee testified that she knew which lanes were closed because they "were blocked off with barrels." (Tr. 17:18–19.) She

---

[3] More generally, there was public notice of the changes in traffic patterns due to the construction. (*See* Gov. Exs. 2A, 2B & 2C.)

further testified in detail that Defendant moved barrels marking the two lanes of traffic which required drivers in the northbound lane to drive around the barrels as well as Defendant. (Tr. 18:21–19:12.) Additionally, Sergeant Wilson testified—and reported in the Park Police radio runs—that Defendant crossed over the median and entered the closed portion of the GW Parkway before stopping his vehicle in front of a "Do Not Enter" sign. (Tr. 44:4–14.) Defendant did not have permission to move the barrels, to make any changes to the lane closures, to enter the northbound lane, to lie down in the northbound lane, or to enter the section of the Parkway that was closed to traffic and under construction.

Accordingly, the Court finds that the evidence establishes beyond a reasonable doubt that Defendant is guilty of violating a closure in violation of 36 C.F.R. 1.5(f).

### b. <u>Refusal</u>

Defendant is charged with refusal to submit to a breath test for the purpose of determining alcohol content under 36 C.F.R. § 4.23(c). Section 4.23(c)(1) provides:

> At the request or direction of an authorized person who has probable cause to believe that an operator or a motor vehicle within a park area has violated a provision of paragraph (a) of this section, the operator shall submit to one or more tests of the breath, saliva, or urine for the purpose of determining blood alcohol and drug content.

36 C.F.R. § 4.23(c)(1). The Regulation further states that "[r]efusal by an operator to submit to a test under paragraph (c)(1) is prohibited and proof of refusal may be admissible in any related judicial proceeding." *Id.* § 4.23(c)(2).

Based on their observations, the U.S. Park Police officers who responded to the scene, including Sergeant Wilson and Officer Harper, had probable cause to believe that Defendant was driving while under the influence on National Park Service property in violation of 36 C.F.R. § 4.23(a). The evidence reflects that Sergeant Wilson informed other officers at the scene that she

11

smelled alcohol on Gayles.  (*See,* Def. Ex. 1.)  As one example, Sergeant Wilson was asked by a fellow law enforcement officer whether Gayles "is 55?"  Sergeant Wilson responded, "he smells like it" and waved her hands in front of her face.  (Def. Ex. 1, at 8:47–54.)  At trial, Sergeant Wilson testified that "55" is a reference from a prior 10 code for 10-55, which is a drunk driver, and confirmed that, on the scene, she believed Gayles was a drunk driver.  (Tr. 56:2–10.)  As reflected in the body camera footage, officers on the scene discussed trying to locate an officer who could perform a breath test.  (*See, e.g.*, Def. Ex. 1, at 9:05.)  At trial, Officer Harper testified that he has personal experience with individuals who are under the influence of alcohol and that he has performed more than 100 traffic stops in which the driver was suspected to be under the influence.  (Tr. 105:3–106:2.)  Based on his personal and professional experience, Officer Harper believed Defendant was under the influence.  (*Id.*)

The officers also had probable cause to believe Defendant was intoxicated based on his behavior.  Moments before encountering Gayles, the officers were receiving reports that he had blocked traffic with his car on the GW Parkway, was standing and laying down in oncoming traffic, and had placed traffic barrels on other cars.  (Gov. Ex. 5.)  Sergeant Wilson observed Defendant coming towards her head-on in a single lane, and then abruptly veer off the roadway into the median of the GW Parkway, cross the length of the median, and enter the closed portion of the GW Parkway.  She observed that he was driving at a high rate of speed.  (Gov. Ex. 5; *see also* Def. Ex. 1; Tr. 54:17–55:5.)  Defendant's erratic and dangerous driving behavior further indicates that Defendant was driving under the influence such that the officers had probable cause to require him to submit to a breath test.  Accordingly, Gayles was required to submit to a breath test under 36 C.F.R. § 4.23(c)(2).  He refused to do so.  Gayles told Sergeant Wong at least twice that he would not agree to a breath

test and checked the box on the 36 C.F.R. Chemical Testing Notice form that he refused testing. He initialed and signed the form. (Def. Ex. 7.)

The Court finds that the evidence establishes beyond a reasonable doubt that Defendant is guilty of refusal to submit to a breath test in violation of 36 C.F.R. 4.23(c)(2).

### c. DUI

Lastly, Gayles is charged with operating a vehicle under the influence of alcohol, a drug, or drugs, or any combination thereof in violation of 36 C.F.R. § 4.23(a)(1). To prove the elements of this offense, the Government must show that Gayles (1) was operating or was in actual physical control of a vehicle, (2) under the influence of alcohol and/or drugs, (3) to such a degree that rendered him incapable of safe operation. *See United Sates v. Wilson*, 711 F. App'x 706, 709 (4th Cir, 2017); *see also United States v. King*, 894 F. Supp. 2d 737, 745 (W.D. Va. 2012). The Court finds that the Government has proven all three elements beyond a reasonable doubt.

First, the Government has established that Defendant was operating a vehicle on the evening of April 22, 2023, as Ms. Lee and Sergeant Wilson both testified that they saw him drive the car that evening. Second, the Government has also established that Defendant was incapable of safe operation of that vehicle. The evidence shows that Mr. Gayles stopped his car in the only lane going in the southbound direction at 11:00 p.m. on a dark roadway that was clearly a construction zone. Cars approaching behind him also had to stop because he was blocking the lane. *See Wilson*, 711 F. App'x at 710 ("A reasonable finder of fact could conclude that a person who smells of alcohol and parks his car in a position that blocks highway traffic at 4 a.m. was incapable of operating his vehicle safely."). Gayles then exited his vehicle and engaged in dangerous behavior that put himself and other drivers at risk: He moved traffic barrels that were separating northbound traffic from southbound traffic in a dynamic construction zone with temporary compressed lanes of traffic, put at

13

least one traffic barrel on Ms. Lee's car, and laid down in the northbound lane of traffic. Ms. Lee testified to the novelty of the situation and the possibility that Defendant would get hurt. (Tr. 34:12–18.) Moreover, upon re-entering his vehicle, Defendant drove straight towards an on-coming police car and then abruptly left the road entirely, crossed a grassy median, and re-entered the GW Parkway on the completely opposite side—a side that was closed for construction and marked with a "Do Not Enter" sign, traffic barrels, and other barriers. The Defendant's behavior demonstrates that he was unable to safely operate his vehicle. *See United States v. Smith*, 701 F.3d 1002, 1011 (4th Cir. 2012) (finding that the defendant's erratic behavior, wandering into the road, and smelling of alcohol were indicia of her guilt).

Finally, the Court finds that the totality of the evidence demonstrates beyond a reasonable doubt that Defendant Gayles was driving while under the influence of alcohol, a drug, or drugs, or a combination thereof to a degree that rendered him incapable of safe operation of his vehicle. Notably, to prove a violation of 36 C.F.R. § 4.23(a)(1), the Government need not prove a particular blood alcohol level, and the Court may look at the totality of the evidence to determine whether a defendant was intoxicated to a degree that rendered him incapable of safe operation of a vehicle. *See Smith*, 701 F.3d at 1005 (noting that 36 C.F.R. § 4.23(a)(1) "does not require the government to prove the defendant's blood alcohol level"); *see also United States v. Crow*, 2012 WL 4953096, *5 (E.D. Va. Oct. 11, 2012)(finding the evidence reviewed in its totality sufficient to support conviction for driving under the influence); *King*, 894 F. Supp. 2d at 745–46 (finding that the evidence can include officer's observations and defendant's behavior and smell of alcohol about the defendant's person).

Here, the Government presented evidence that Gayles smelled of alcohol, drove erratically and dangerously (even crossing a median), failed to obey multiple traffic designations in a condensed construction zone, stopped his vehicle late at night on a dark road and blocked traffic, responded with

14

obscenities to Ms. Lee when she offered assistance, wandered around the GW Parkway in the midst of traffic (even laying down in the road at one point), and took traffic barrels from their position marking lane divisions and placed them on and in front of another driver's car—all of which supports conviction. *See Wilson*, 711 F. App'x at 709–10 (affirming 36 C.F.R. § 4.23(a)(1) conviction where defendant smelled of alcohol, performed poorly on sobriety tests, had vomit in his car, and acted abnormally including screaming profanities); *Crow*, 2012 WL 4953096, at *4 (finding defendant's "strange and dangerous driving" gave rise to an inference defendant was intoxicated).

Additionally, Defendant's overall deportment is further evidence of intoxication. During the incident, Gayles wore only one shoe and eventually no shoes, and donned sunglasses outside at 11:00 p.m. Although he apparently did not slur his words, Gayles's statements were at times illogical, and his demeanor was incongruent with the seriousness of the situation. Indeed, during processing at the Park Police station, after he had been arrested, Defendant joked and laughed, even while being fingerprinted and informed about the charges against him. (*See, e.g.*, Def. Ex. 4, at 34:20, 48:03, 1:02:50–1:03:12); *see Crow*, 2012 WL 4953096, at *4 (finding defendant's "oddly calm" demeanor following accident as indicia of intoxication). And while witnesses testified on cross-examination that they did not see Gayles stumble or fall, that conduct is not required to prove a defendant's intoxication. *See Wilson*, 711 F. App'x at 709 ("The regulation does not provide certain pieces of evidence such as slurred speech or empty containers as elements required to prove intoxication.")

Accordingly, the Court finds that the totality of the evidence establishes that Gayles was under the influence to a degree that rendered him incapable of safe operation. His behavior that night was dangerous; he put himself, other drivers on the GW Parkway, and the law enforcement officers who pursued and arrested him at risk. As described in detail above, Gayles behaved erratically inside and outside of his vehicle, smelled of alcohol, and exhibited an apparent inability to grasp the gravity of

15

his behavior or the consequences thereof—all of which evidence that he was under the influence. The above evidence coupled with his refusal to take a breath test establishes beyond a reasonable doubt that Gayles was under the influence. *See, e.g.*, *Crow*, 2012 WL 4953096, at *6 (listing defendant's breath test refusal paired with other evidence, including erratic and reckless driving, odd behavior, odor of alcohol, and denial he had consumed alcohol as substantial evidence to support conviction for drunk driving); *see also King*, 894 F. Supp. 2d at 746 (stating that, under 36 C.F.R. § 4.23(c)(2), the court may draw a negative inference from a defendant's refusal to provide a breath sample).

Accordingly, the Court finds Defendant guilty of driving under the influence of alcohol, a drug, or drugs, or a combination thereof to a degree that rendered him incapable of safe operation in violation of 36 C.F.R. § 4.23(a)(1).

### III.   CONCLUSION

As set forth above, the Court finds Defendant Gayles **GUILTY** of violating 36 C.F.R. § 1.5(f), 36 C.F.R. § 4.23(a)(1), and 36 C.F.R. § 4.23(c)(2). At the conclusion of the bench trial on April 24, 2024, the Court set a status conference for July 30, 2024. That status conference will be converted to a sentencing hearing and the Court will request that a Presentence Investigation Report be prepared. An order shall issue forthwith.

**ENTERED** this 9th day of May, 2024.

/s/ *LRV*
Lindsey Robinson Vaala
United States Magistrate Judge

Alexandria, Virginia